UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MATTHEW FINE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:19-30067-KAR |
| | ) | |
| | ) | |
| THE GUARDIAN LIFE INSURANCE | ) | |
| COMPANY OF AMERICA, | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
(Dkt No. 87)

ROBERTSON, U.S.M.J.

Plaintiff Matthew Fine (Fine) was an insurance salesman for defendant The Guardian

Life Insurance Company of America (Guardian).[1]  In his amended complaint, Fine alleges that

Guardian violated the implied contractual covenant of good faith and fair dealing when it failed

to pay him renewal commissions after Guardian terminated its agreement with him (First Count).

Fine also asserts a common law claim of unjust enrichment (Second Count) and contends that

Guardian's failure to pay him commissions was in violation of the Massachusetts Wage Act,

Mass. Gen. Laws ch. 149, § 148 (Third Count) (Dkt. No. 40).  Before the court is Guardian's

motion for summary judgment on all counts (Dkt. No. 87).  The parties have consented to this

court's jurisdiction (Dkt. No. 14).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following

reasons, Guardian's motion for summary judgment is granted in part and denied in part.

---

[1] The court previously dismissed Fine's claims against Park Avenue Securities (Dkt. No. 65).

## I.     FACTUAL BACKGROUND[2]

Except as otherwise noted, the following facts are undisputed.  Because this case is before the court on a motion for summary judgment, the court sets out any disputed facts in the light most favorable to Fine, the non-moving party, and draws all reasonable inferences in his favor, *Joseph v. Lincare, Inc.*, 989 F.3d 147, 151 (1st Cir. 2021) (citing *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4 (1st Cir. 2015)), reserving some facts for discussion in the analysis.

### A.  Fine's Position with Guardian

Guardian produces insurance policies (life, disability, and long-term care) which it sells, insofar as pertinent to this case, through field representatives (Def. SOF ¶ 1; Pl. Resp. ¶ 1).  Plaintiff signed a Guardian field representative agreement (FRA) and began selling Guardian policies in or around 1997 (Def. SOF ¶ 2; Pl. Resp. ¶ 2).  Neither party has located a copy of a Guardian FRA signed by Fine (Def. Resp. at 3-4).[3]  During Fine's sales work for Guardian, he was associated with a general agency, Robert Fine & Associates (Def. SOF ¶ 3).  The agency was established by Fine's father and, by 2018, was headed by Fine's brother, Randy Fine (Pl. SOF ¶ 1).[4]

---

[2] The facts are taken from Guardian's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment (Def. SOF) (Dkt. No. 94); the single document captioned Plaintiff's Response to Defendant's Statement of Material Facts and Plaintiff's Statement of Material Disputed Facts in Support of Plaintiff Matthew Fine's Opposition to Defendant's Motion for Summary Judgment (the first section of which is cited as Pl. Resp. and the second section of which is cited as Pl. SOF) (Dkt. No. 103); Defendants' Response to Plaintiff's "Concise Statement of Material Facts in Support of Plaintiff Matthew Fine's Opposition to Defendant's Motion for Summary Judgment" (Def. Resp.) (Dkt. No. 114); and from materials cited therein.

[3] At the hearing on Guardian's summary judgment motion, Fine admitted, through counsel, that he signed a form of a Guardian FRA (Dkt. No. 117 at 40-44).  Plaintiff's position is that, in the absence of a signed agreement, he is not sure that the copy of the FRA Guardian has filed with the court is the form of agreement he signed when he joined Guardian (Dkt. No. 117 at 40-44).

[4] For the sake of clarity, Randy Fine will be referred to herein as Randy.

B.  <u>Fine's May 6, 2018, Trip to Washington, D.C.</u>

On or around May 6, 2018, Fine traveled to Washington, D.C. to attend Guardian's

annual conference, which was held at the Marriott Marquis Washington D.C. (Pl. SOF ¶¶ 3-4).

On May 6, 2018, Fine had dinner with some Guardian colleagues, including Jeremy Suarez (Pl.

SOF ¶¶ 5-7).  After dinner, Fine and Suarez traveled together to the Marriott, where both had

rooms booked for the night (Pl. SOF ¶¶ 7-8).  Fine and Suarez repaired to the hotel's bar, where

they were approached by two women.  Neither Fine nor Suarez was acquainted with either of the

women (Pl. SOF ¶ 10).  After having drinks together, the group went to Suarez's hotel room,

where Fine had a consensual sexual encounter with one of the women (Pl. SOF ¶ 12).  With the

woman's consent, Fine took pictures of the encounter (Pl. SOF ¶¶ 13-15).

C.  <u>Report About Fine's Conduct to the Marriott</u>

Sometime after Fine left Suarez's room and before 3:00 a.m., a Marriott guest reported a

sexual assault to the Marriott staff at the hotel's front desk (Pl. SOF ¶ 18).  Members of the

Marriott security team went to the room of the guest who had allegedly been sexually assaulted.

Another guest in the room reported that she had heard the woman crying and that the woman

said she had been raped by a guy she met in the Marriott's bar (Pl. SOF ¶ 19).

Around 3:30 a.m., Fine was woken up by the Marriott security staff and an officer or

officers of the Metropolitan D.C. police force (Pl. SOF ¶ 20).  Members of the security staff

remained in Fine's room until a detective from the D.C. police force arrived to interview him (Pl.

SOF ¶ 20).  Fine told the detective that he was being falsely accused of sexual assault and that he

had photographs to prove it, but he wanted to consult a lawyer before he showed the photographs

to the police (Pl. SOF ¶ 21).  Members of the Marriott security staff told Plaintiff that he had to

leave the hotel (Pl. SOF ¶ 24).  Around 6:00 a.m. on May 7, 2018, Fine called his brother Randy.

When Randy came to Fine's room, Fine told Randy that he had been falsely accused of sexual assault (Pl. SOF ¶¶ 22-23).

D.      Notification to Guardian and Guardian's Response

The accusation against Fine sparked a series of internal communications among high-level Guardian employees.  Guardian had arranged with the Marriott that the Marriott would communicate with Neha Kowal, a Guardian second vice president and head of conference and event marketing, if there were issues or problems with individuals attending the Guardian conference (Def. SOF ¶¶ 12, 29).  Early on May 7, 2018, Marriott's general manager and members of its security department woke up Kowal and informed her that a Guardian salesperson had been accused of sexual assault (Def. SOF ¶ 30).  Kowal, who was distressed by the conversation, reported what she had been told to Guardian's general counsel (Def. SOF ¶¶ 31-32).  Later that morning, Kowal and Dennis Byrne, Guardian's senior security specialist, met with members of Marriott's security department and were told that police officers had been called to the hotel because Fine had been accused of raping a woman, that someone had heard screams coming from the room where the alleged rape had occurred, that an ambulance had been called and had taken the woman from the hotel to the hospital, and that Fine had been evicted from the Marriott (Def. SOF ¶¶ 33-37; Pl. SOF ¶ 36).[5]

---

[5] To the extent Fine objects to the court's consideration of this information on hearsay grounds notwithstanding its inclusion in *his* statement of facts, the court does not consider the evidence for its truth but as evidence of the state of mind of Guardian's senior managers in the early morning hours of May 7, 2018, and their motive for discharging Fine.  For this purpose, it is admissible.  *See SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 332 F. Supp. 3d 446, 476 (D. Mass. 2018) (discussing the state-of mind hearsay exception and collecting relevant cases).  It is not signficant that the declarants were not specifically identified, because the relevance of the statements depends on the fact that they reported an accusation of rape against Fine along with related events.  *Id.* at 477 (citing *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 n.11 (3d Cir. 1999)).

Following Kowal and Byrne's meeting with members of Marriott's security team, they reported what they had been told to Guardian executive vice president Chris Dyrhaug, who reported the information to Guardian's chief executive officer, Deanna Mulligan (Def. SOF ¶ 38). Mulligan, in turn, conferred with Guardian's general counsel (Def. SOF ¶ 39). Mulligan also spoke with Byrne and Dyrhaug to confirm what they had heard from the Marriott security team (Def. SOF ¶ 41). In the morning on May 7, 2018, Dyrhaug told Mulligan that it was possible Fine would be charged with rape. By the afternoon of that day, Mulligan had been told that Fine would not be charged at that time (Pl. Resp. ¶ 42). At some point, Dyrhaug called Randy and told him that Fine's agreement with Guardian was going to be terminated (Pl. SOF ¶ 27). Randy asked whether Guardian had all of the facts, how the decision could have been made so quickly, and whether there was a way to avoid terminating Fine's agreement with Guardian (Pl. SOF ¶ 28; Pl. Resp. ¶ 44).

Deeming that she had an obligation to do so, early on May 8, 2018, Mulligan reported the information she had been given to Guardian's board of directors through the board's crisis response special committee. The three members of the committee agreed with Mulligan's recommendation that Fine's association with Guardian should end (Def. SOF ¶¶ 45-47). Guardian's general counsel and its former general counsel, who continued to work for Guardian as a consultant, were also of the opinion that Fine's agreement with Guardian should be terminated (Def. SOF ¶ 48).

    E.    <u>Guardian Terminates its Agreement with Fine</u>

Sometime during the evening of May 7, 2018, Fine became aware of rumors that his agreement with Guardian was going to be terminated (Pl. SOF ¶ 29). Fine retained a defense attorney during the morning of May 8, 2018, who emailed Dyrhaug and stated that the

allegations against Fine were false, that the attorney could prove it, and that the attorney wanted Guardian managers to have this information before they made a decision about Fine's future with Guardian (Pl. SOF ¶¶ 30-31). The defense attorney spoke with the investigating police detective and showed the detective photographs that Fine had taken (Pl. SOF ¶ 32). The police detective told Fine's attorney that the photographs contradicted what the detective had been told, that Fine would not be arrested, and that no charges would be brought against him (Pl. SOF ¶ 32).

On May 8, 2018, Mulligan, the board of directors, Guardian's general counsel, and Guardian's former general counsel decided to terminate Guardian's agreement with Fine in compliance with the two-week notice provision that appeared in the Guardian FRA (Def. SOF ¶ 50). Dyrhaug was tasked with communicating the decision to Fine (Def. SOF ¶ 60). He did so by telephone on May 8, 2018, informing Fine that Guardian was terminating its agreement with him because Guardian had "lost faith" in him, and telling him that he would receive a termination letter by mail (Def. SOF ¶ 61), which he subsequently did. The letter provided that Fine's agreement with Guardian was terminated effective May 22, 2018, pursuant to the 14-day notice provision in the FRA (Def. SOF ¶ 62).[6]

F.    Evidence of Guardian's Reason for Terminating Its Agreement with Fine

Fine's amended complaint alleged that Guardian used the report about Fine's conduct at the Marriott as a pretext to end its relationship with Fine "to avoid future renewal, pension, and other payments" (Am. Compl. ¶ 48). At his deposition, Fine testified that he does not "have any knowledge of" Guardian terminating its agreement with him to avoid paying him commissions, retirement, pension, or other monies, and that he was "speculating" that the reason Guardian

---

[6] The letter referred to an effective termination date of May 22, 2017. The parties agree that the reference to 2017 was a typographical error and that Guardian terminated Fine's agreement with the company effective May 22, 2018 (Pl. Resp. ¶¶ 65-66).

ended its agreement with him was to avoid making payments required under the agreement (Def. SOF ¶¶ 72-75). At this time, Fine concedes that his entitlement to commissions and other future payments were not a factor in Guardian's May 2018 decision to end its agreement with him (Def. SOF ¶ 76), and that Guardian terminated its agreement with him exclusively based on the events that took place from May 6 to May 8, 2018 (Pl. Resp. ¶ 47).

G.   Post-Termination Remuneration

While Fine was associated with Guardian, he was paid renewal commissions based his sales of insurance and other products (Def. SOF ¶ 79). The commission amount varied product-by-product (Def. SOF ¶ 81; Pl. Resp. ¶ 81). Guardian does not pay its field representatives renewal commissions based on a percentage of premiums. Renewal commissions are based on a formula that is dependent on the persistency of a field representative's book of business that is referred to as the persistency renewal factor (Def. SOF ¶ 82; Pl. Resp. ¶ 82). Based on the persistency renewal factor, a field representative earns a varying percentage of the renewal premiums on his or her block of business depending on how many policies remain in force and the type of products sold (Def. SOF ¶ 83; Pl. Resp. ¶ 83). The amount of a renewal commission on a particular policy may also vary if a customer makes an addition to the policy after its purchase (Def. SOF ¶ 84). A field representative only receives renewal commissions on policies after the customer pays the renewal premium (Def. SOF ¶ 85). On average, 95 % of Guardian policies are renewed each year (Pl. SOF ¶ 56; Def. Resp. ¶ 56). Over the twenty years preceding the termination of Fine's agreement with Guardian, Fine's lapse rate was 3%, meaning that, during Fine's association with Guardian, 97% of his book of business renewed each year, and his persistency renewal factor was around 7% (Pl. SOF ¶ 59; Def. Resp. ¶ 59).

II.   **ANALYSIS**

7

A. <u>Preliminary Matters</u>

1. Field Representative Agreement

As an initial matter, the court considers whether, in the absence of a signed copy, the summary judgment record should include the FRA attached to the declaration of Gregory Blazinski, which is represented by Guardian to be the form of FRA that was signed by Fine when he began his relationship with Guardian (Dkt. No. 9-2 at 1-6).[7] Fine does not dispute that he signed an FRA when he joined Guardian. He apparently objects to the court's consideration of the FRA attached to the Blazinski declaration on the grounds that the FRA Guardian has submitted was not signed by Fine (e.g., Pl. Resp. ¶ 2). For its part, Guardian asserts that it has submitted sufficient evidence to establish that the agreement attached to the Blazinski declaration is the form of FRA that Fine signed when he joined Guardian (Dkt. No. 114 at 4-6).

The First Circuit held in 2019 that a document must be authenticated to be admissible at the summary judgment stage. *See G. v. Fay Sch.*, 931 F.3d 1, 14 (1st Cir. 2019) (citing *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000)). In 2021, in the *Joseph* case, the court, while accepting the parties' position that evidence had to be authenticated to be considered on summary judgment, pointed to rulings from other circuit courts of appeals holding that, after a 2010 revision to Fed. R. Civ. P. 56(c)(2), the party proffering the evidence at summary judgment is only required to show that the party would be able to authenticate the evidence at trial. *See Joseph*, 989 F.3d at 155 n.4 (citing, *inter alia*, *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) (noting that, after the 2010 amendment to Rule 56, all that must be shown is that the evidence is capable of authentication at trial); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (ruling that a statement could be considered at summary judgment if it

---

[7] Precisely the same document, with identical attachments, also appears at docket number 90.

8

could be 'reduced' to admissible form by the time of trial) (citation omitted)).  Assuming,

nonetheless, as the parties do, that Guardian must authenticate the field representative agreement

it submitted if the agreement is to be considered in connection with Guardian's summary

judgment motion, *see Joseph*, 989 F.3d at 155, the court turns to the authentication question.

> Rule 901 of the Federal Rules of Evidence provides that "[t]o satisfy the
> requirement of authenticating or identifying an item of evidence, the proponent
> must produce evidence sufficient to support a finding that the item is what the
> proponent claims it is."  Fed. R. Civ. P. 901(a).  In section (b), the rule identifies
> examples of ways to authenticate evidence, including through testimony of a
> witness with knowledge.  Fed. R. Evid. 901(b).  Thus, "[a] document can be
> authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it,
> or saw others do so."  *United States v. Landrón-Class*, 696 F.3d 62, 69 (1st Cir.
> 2012) (alterations in original) (quoting *Orr v. Bank of Am., NT & SA*, 285 F.3d
> 764, 774 n.8 (9th Cir. 2002)).

*Id.* at 156.  "The standard the district court must apply in evaluating a document's authenticity is

whether there is 'enough support in the record to warrant a reasonable person in determining that

the evidence is what it purports to be.'"  *United States v. Blanchard*, 867 F.3d 1, 6 (1st Cir. 2017)

(quoting *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir. 1994)).  "The authentication

requirement is not demanding and may be satisfied with 'competent testimony' indicating that

the document is what it appears to be."  *Latimore v. Trotman*, CIVIL ACTION N. 14-13378-

MBB, 2021WL 5763009, at *5 (D. Mass. Dec. 3, 2021) (citing *Goguen ex rel. Estate of Goguen

v. Textron, Inc.*, 234 F.R.D. 13, 16-17 (D. Mass. 2006) (stating that the process of authentication

is "rarely onerous")).

For the following reasons, the court finds that Guardian has sufficiently authenticated the

FRA attached to the Blazinski declaration, even if in a somewhat barebones fashion.  First, Fine

does not dispute that he signed an FRA when he joined Guardian, nor does he dispute that the

version submitted by Guardian may be the version he signed (Dkt. No. 117 at 43-44).  *See

Maurer*, 870 F.3d at 384 (ruling that the district court erred when it refused to take into account

an unsigned contract submitted by the plaintiff on summary judgment where it was undisputed that the parties had entered into an agreement and the defendants did not contend that the agreement plaintiff submitted was not the parties' agreement).  Second, Guardian employees with personal knowledge about the operations of the field representative system and documents related to the system have authenticated the FRA attached to Blazinski's declaration as the FRA that was in effect in 1997 and that Fine would, therefore, have signed.  *See NWS Corp. v. Dish Network, LLC*, No. 13cv2247-GPC (BGS), 2014 WL 769175, at *2 (S.D. Cal. Feb. 25, 2014) (a witness with personal knowledge about the operations of a sales support division and its procedures could authenticate an unsigned form contract as the parties' operative agreement). Leyla Lesina, Guardian's Fed. R. Civ. P. 30(b)(6) deponent, who was employed as a senior vice president and Guardian's head of agency distribution, testified that Guardian had only one version of its field representative agreement in effect at any one time (Def. SOF ¶¶ 2, 12). Blazinski was a lead contracting and licensing consultant for Guardian (Dkt. No. 9-1 at 1).  He had personal knowledge based on his review of relevant Guardian documents and communications with other Guardian employees sufficient to verify that the FRA attached to his declaration was the form of agreement that was in effect when Fine joined Guardian (Dkt. No. 9-1 ¶ 2).  *See Joseph*, 989 F.3d at 156 (citing Fed. R. Evid. 901(b)(1); evidence from a witness with knowledge that the item is what it purports to be satisfies the requirement of authentication). Finally, Fine has not identified any provisions in the FRA attached to Blazinski's declaration that he claims differ from the FRA he acknowledges he signed.  *Cf. id.* (holding that the trial court erred in declining to consider documents when, among other things, the party opposing their admission never claimed that the documents were not authentic).  For the foregoing reasons, the

court finds that Guardian has sufficiently authenticated the FRA in the record that it should be relied on for summary judgment purposes.

As to its content, the FRA purports to classify Guardian field representatives as independent contractors rather than employees and further provides, in pertinent part, that Guardian's field representatives are to solicit applications for life, health, and group insurance and other company products; aid in the maintenance of insurance in force; and render service to policyholders and beneficiaries (Dkt. 9-2 at 4).  The FRA incorporates by reference provisions of the Guardian field representative plan (FRP), including provisions that outline "incentive compensation earned by and payable to [a field representative]" (Dkt. No. 9-1 at 4, 6).  The FRA provides that either party may voluntarily terminate the agreement at any time by written notice, to be effective not earlier than two weeks from the date of delivery of the notice of termination. The FRA provides that, "[o]n termination, [Guardian's] liability for remuneration of any kind shall cease except as set forth in the Field Representative Plan" and that, except as provided for in the FRP, "there is no vesting of commissions" (Dkt. No. 9-1 at 5, 6).

2.   Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction." *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is

'material' when its (non)existence could change a case's outcome." *Id.* (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor. *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

### B. Unjust Enrichment Claim (Second Count)

Because the court has concluded that the FRA submitted by Guardian is admissible as evidence of the parties' agreement, the court turns first to Fine's unjust enrichment claim. Claims of unjust enrichment and quantum meruit "represent alternative theories of recovery that can only be awarded where no express contract covers the matter." *Viscito v. Nat'l Planning Corp.*, Civil Action No. 18-30132-MGM, 2021 WL 359314, at *6 (D. Mass. Jan. 22, 2021), *appeal docketed*, No. 21-1081 (1st Cir. Feb. 2, 2021); *see also York v. Zurich Scudder Invs., Inc.*, 849 N.E.2d 892, 901 (Mass. App. Ct. 2006) ("It is well settled that quantum meruit relief may not be granted where an express contract governing the matter exists.") (citing *Boswell v. Zephyr*

12

*Lines, Inc.*, 606 N.E.2d 1336, 1342 (Mass. 1993); *Zarum v. Brass Mill Materials Corp.*, 134 N.E.2d 141, 143 (Mass. 1956)). "'[A] party with an adequate remedy at law cannot claim unjust enrichment …. It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment.'" *SiOnyx, LLC.*, 332 F. Supp. 3d at 473 (quoting *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017); citing additional cases).

Fine's sole argument in opposition to so much of Guardian's motion as seeks dismissal of his unjust enrichment claim is that, lacking an FRA signed by Fine, Guardian cannot rely on cases where the existence of a signed agreement is undisputed (Dkt. No. 102 at 24). Guardian, however, has authenticated the FRA attached to the Blazinski declaration as the form of agreement signed by Plaintiff when he joined Guardian, meaning that the court has found that the parties' relationship is governed by the terms of a written agreement. In *York*, a case in which, like Fine, the plaintiff claimed to be entitled to recovery for a breach of the implied duty of good faith and fair dealing, the Massachusetts Appeals Court gave short shrift to the plaintiff's quantum meruit claim.[8] *See York*, 849 N.E.2d at 901. Guardian is entitled to judgment on Fine's unjust enrichment claim.

   C.  Wage Act Claim (Third Count)

The third count of Fine's amended complaint alleges that Guardian violated the Massachusetts Wage Act by failing to pay Fine renewal commissions on policies he sold while he was associated with Guardian.

"The purpose of the Wage Act is 'to protect employees and their right to wages,' *Electronic Data Sys. Corp. v. Attorney Gen.*, … 907 N.E.2d 635 ([, 641 [Mass.] 2009), by

---

[8] Under Massachusetts law, claims of unjust enrichment and quantum meruit are closely related. "'[T]he underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party.'" *Liss v. Studeny*, 879 N.E.2d 676, 682 (Mass. 2008) (quoting *Salaman v. Terra*, 477 N.E.2d 1029, 1031 (Mass. 1985)).

requiring employers to pay employees their wages 'in a timely fashion, according to the parameters set out in the statute.' *Okerman v. VA Software Corp.*, … 871 N.E.2d 1117[, 1121 (Mass. App. Ct.] 2007)." *Parker v. EnerNOC, Inc.*, 139 N.E.3d 328, 333 (Mass. 2020) (citing Mass. Gen. Laws ch. 149, § 148, first par.). "To state a claim under Mass. Gen. Laws ch. 149[,] § 148, a plaintiff must allege that (1) []he was an employee under the statute, (2) [his] form of compensation constitutes a wage under the statute, and (3) the defendants violated the Act by not paying [him] wages in a timely manner." [9] *Gallant v. Boston Exec. Search Assocs., Inc.*, Civil Action No. 13-12081-FDS, 2015 WL 3654339, at *6 (D. Mass. June 12, 2015) (citing *Stanton v. Lighthouse Fin. Servs., Inc.*, 621 F. Supp. 2d 5, 10 (D. Mass. 2009)); *see also Ellicott v. Am. Capital Energy, Inc.*, 906 F.3d 164, 169 (1st Cir. 2018) (citing *Stanton*, 621 F. Supp. 2d at 10).

The Massachusetts Supreme Judicial Court (SJC) has explained that, as it pertains to commissions, the Wage Act states:

> "This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of [G.L. c. 149, § 150]."
>
> G.L. c. 149, § 148, fourth par.  That is, the act requires that commissions are to be paid when two conditions are met: (1) the amount of the commission "has been definitely determined"; and (2) the commission "has become due and payable." G.L. c. 149, § 148, fourth par.  In contrast, other forms of wages, once earned, are to be paid on a regular schedule.  G.L. c. 149, § 148, first par.

*Parker*, 139 N.E.3d at 333.  To the extent the renewal commissions Fine claims by his amended complaint are deemed unpaid wages under the Wage Act, they are subject to mandatory trebling. *See id.* at 335 ("Wages lost as a result of retaliation are trebled under the Wage Act. G.L. c. 149,

---

[9] For purposes of summary judgment only, Guardian has not disputed that Fine would be able to show that he was an employee under the statute.

§§ 148A, 150."); *Mui v. Mass. Port Auth.*, 89 N.E.3d 460, 462 (Mass. 2018) (noting that violations of the Wage Act result in strict liability and treble damages in the civil context).

"In order to be 'definitely determined,' a commission must be 'arithmetically determinable.'" *McAleer v. Prudential Ins. Co.*, 928 F. Supp. 2d 280, 287 (D. Mass. 2013) (quoting *Wiedmann v. The Bradford Grp., Inc.*, 831 N.E.2d 304, 312 (Mass. 2005) (*superseded by statute on other grounds*)). "Moreover, a commission is 'due and payable' when dependent contingencies have been met and it is thus owed to the employee." *Ellicott*, 906 F.3d at 169 (citing *McAleer*, 928 F. Supp. 2d at 288). "When a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan …." *McAleer*, 928 F. Supp. 2d at 289 (citing *Watch Hill Partners v. Barthel*, 338 F. Supp. 2d 306, 307-08 (D.R.I. 2004)). *See Smith v. Unidine Corp.*, SUCV20152667, SUCV2015-3417, SUCV2016-3297, 2017 WL 4411249, at *5 (Mass. Super. July 25, 2017).

The FRA Fine signed provided, as to compensation, that he would be paid a salary and "incentive compensation earned by and payable to him according to the Field Representative Plan" (Dkt. No. 9-2 at 4). The FRP set out the formulas by which Fine's commissions on various products were calculated based on various factors, including the nature of the product at issue, the schedule on which premiums were paid, and a persistency factor, meaning the extent to which policies sold by the agent were renewed (Dkt. No. 119 at 54-59). Guardian's Rule 30(b)(6) deponent testified that Guardian determined a field representative's commission rate annually on the anniversary of the date the field representative entered into his or her agreement

with Guardian, while renewal commissions were paid to the field representative "all throughout the year" as premium payments were received (Dkt. No. 119 at 48).[10]

While the extent of Fine's claims under the Wage Act are not entirely clear, it appears that he asserts he is entitled to collect commissions on renewals of Guardian insurance policies he sold for as long as Guardian continues to be paid renewal premiums for any policy Fine sold during his association with Guardian (Dkt. No. 102 at 22-24).  To the extent the FRA and the FRP end a field representative's entitlement to renewal commissions after the agreement between a field representative and Guardian is terminated, Fine argues that these provisions violate the statutory prohibition against special contracts that purport to exempt an employer from compliance with the Wage Act.  *See* Mass. Gen. Laws ch. 149, § 148, sixth par.  Guardian argues that the renewal commissions Fine seeks to recover were neither due and payable nor arithmetically determinable when Guardian ended its association with Fine.  Guardian has the better of the arguments.

1.      Fine's Future Commissions Were Not Due and Payable

"Commissions are due and payable when 'any contingencies relating to their entitlement have occurred.'"  *McAleer*, 928 F. Supp. 2d at 288 (quoting *Micchie v. N.R.I. Data & Bus. Prods., Inc.*, Civil Action No. 09-11661-GAO, 2011 WL 4479849, at *6 (D. Mass. Sept. 27, 2011); *Sterling Research, Inc. v. Pietrobono*, Civil Action No. 02-40150-FDS, 2005 WL 3116758, at *12 (D. Mass. Nov. 21, 2005)).  The FRA and the FRP provided that, with limited exceptions not at issue here, Fine would not be entitled to remuneration after the termination of his agreement with Guardian.  Continued employment has been identified as a permissible

---

[10] Guardian filed docket number 119 under seal with leave of court.  The court can, however, see no reason why these general statements about Guardian's compensation practices would warrant confidentiality.

contingency that must be satisfied for a commission to be deemed due and payable.  *See Smith*, 2017 WL 4411249, at *4 (stating that "[a] bonus that is … contingent upon the employee remaining with the company for a defined period of time has been held not to be a wage under the [Wage] Act") (citing *Sheedy v. Lehman Bros. Holdings, Inc.*, Civil Action No. 11-11456-RGS, 2011 WL 5519909 (D. Mass. Nov. 14, 2011); *Weems v. Citigroup, Inc.*, 900 N.E.2d 89, 94 (Mass. 2009); *Harrison v. NetCentric Corp.*, 744 N.E.2d 622, 625, 629-30 (Mass. 2001)); *see also Sterling Research, Inc.*, 2005 WL 3116758, at *13 (granting summary judgment on the plaintiff employee's counterclaim for commissions where the plaintiff's employment agreement provided that an individual had to be employed to receive a commission, commissions were paid on a quarterly basis, and the plaintiff was no longer employed when the commission at issue was paid).

For example, in the *Gallant* case, the plaintiff was a legal recruiter employed by Boston Executive Search Associates (BESA).  *See Gallant*, 2015 WL 3654339, at *1.  She placed a partner at the law firm of Reed Smith in or around April 2013.  Reed Smith paid BESA for the placement on June 6, 2013, subject to the condition the BESA would repay Reed Smith 100% of the placement fee if the attorney left Reed Smith within 6 months; 50% of the fee if the attorney left Reed Smith within 7 to 9 months; and 25% of the fee if the attorney left within 10 to 12 months.  Plaintiff's agreement with BESA provided that she would be paid percentage commissions for placements she made, but that any commission would be subject to the terms and conditions of BESA's agreement with the law firm where the attorney was placed.  *Id.* at *1, 4.  Plaintiff's employment with BESA was terminated on June 6, 2013.  She sued to recover a commission on the Reed Smith placement as wages.  *Id.* at *5.  When plaintiff's employment was terminated, the payment to BESA – on which plaintiff claimed the commission – was still

subject to the condition that portions of it might need to be repaid to Reed Smith if the lawyer left Reed Smith within a year of joining the firm.

The court framed the issue as "whether that commission was both 'definitely determined' and 'due and payable,' and therefore a 'wage,' at the time [plaintiff's] employment was terminated." *Id.* at *7. The court held that the commission was not "due and payable" to plaintiff or "definitely determined" because, when her BESA employment was terminated, BESA was not unconditionally entitled to retain the full payment from Reed Smith. Therefore, the court held, the commission plaintiff sought to recover was "not a 'wage' at the time her employment was terminated." *Id.* at *10. The court granted BESA's motion for summary judgment on plaintiff's Wage Act claim. *Id. Contrast Berberian v. G-Form, LLC*, Civil Action No. 14-10422-JCB, 2014 WL 12700578, at *6 (D. Mass. Aug. 29, 2014) (denying so much of the defendant's motion to dismiss as was directed at plaintiff's Wage Act claims for unpaid commissions where the plaintiff "allege[d] that [the commission] amount [was] presently due to him, without condition").

To be sure, there are cases where courts have held that an employee was entitled to a commission as a wage although the commission was not payable until after the termination of employment. In those cases, the employee had done the work to earn the commission before his or her employment was terminated and there were no unsatisfied contingencies that might have altered the amount of the commission or eliminated the employee's entitlement to the commission. For example, in *Israel v. Voya Institutional Plan Servs., LLC*, Civil Action No. 15-cv-11914-ADB, 2017 WL 1026416, at *7 (D. Mass. Mar. 16, 2017), notwithstanding a provision in plaintiff's compensation plan providing that an employee who resigned would not be entitled to a pro-rated payment under the commission plan, the court held that "commissions that

[plaintiff] earned during his final months of employment" were wages under the Wage Act where the plaintiff "did the work to earn the commissions prior to his resignation, and the fact that it may have taken [the employer] a few months to make a final calculation as to the exact amount of the commissions [wa]s not sufficient to take them outside the scope of the Wage Act." *Id.* (citing *Feygina v. Hallmark Health Sys.*, No. MICV2011-03449, 2013 WL 3776929, at *2, 5 (Mass. Super. July 12, 2013) (holding that commissions earned prior to termination of employment were protected by the Wage Act even though they were not calculable until several months later)); *see also Levesque v. Schroder Inv. Mgmt. N. Am., Inc.*, 368 F. Supp. 3d 302, 314 (D. Mass. 2019) (granting defendant's motion to dismiss in part and permitting plaintiff's Wage Act claims to go forward only insofar as plaintiff sought recovery for earned commissions on sales he made prior to the termination of his employment).

Here, Fine's entitlement to renewal commissions was contingent on events that did not, and could not, occur prior to the termination of his association with Guardian, including, in the case of a life insurance policy, that the policy holder survived, and, in the case of any policy, that the policy holder chose to pay the premium to renew the policy.  While Fine sold insurance policies during his association with Guardian that would have entitled him to renewal commissions had he remained with Guardian, such commissions were subject to unmet contingencies and were not "due and payable" when his agreement with Guardian terminated as that phrase has been interpreted by state and federal courts.  *See Gallant*, 2015 WL 3654339, at *10; *Smith*, 2017 WL 4411249, at *5 ("Because there is no earned commission after the termination of employment, a commission is not 'due and payable' as required for recovery of an unpaid commission under the Act.").

    2.    The Future Renewal Commissions Were Not Definitely Determinable.

Nor could Fine's future renewal commissions be "definitely determined" as required by the statute.  *See Okerman v. VA Software Corp.*, 871 N.E.2d 1117, 1124-25 (Mass. App. Ct. 2007).  Viewing the record in the light most favorable to Fine, for at least some period of time, his renewal commissions could be estimated with a high degree of certainty based on his history of renewals in his block of business and factors Guardian uses to calculate renewal commissions. The future renewal commissions, however, are not "arithmetically determinable," *see id.*, because the commission amount would vary depending on the number of policies that were renewed, on Fine's annual persistency factor, which depended on the rate of renewals in his book of business, which presumably would not be static over time, and on changes to policies that could impact commission amounts.  Indeed, Fine concedes that attrition would factor into his entitlement to future renewal commissions (Dkt. No. 102 at 22).  Courts have held that only commission amounts that are arithmetically determinable constitute wages under the Wage Act. *See Gallant*, 2015 WL 3654339, at *10 (holding that the commission plaintiff sought to recover could not be definitely determined when, at the time plaintiff's employment was terminated, there were contingencies that might cause a reduction in its amount); *contrast Ellicott*, 906 F.3d at 169 (holding that commissions were definitely determined for purposes of the Wage Act where "[t]he parties do not dispute the figures necessary to calculate [plaintiff's] sales commissions to the dime."); *Wiedmann*, 831 N.E.2d at 312 ("There is no dispute concerning the total from which deductions would be taken, or about the other formulas and deductions, thus making the amount owed the plaintiff arithmetically determinable.").

     3.     Fine's Arguments.

Fine raises two arguments as to why future renewal commissions on the Guardian policies he sold qualify as wages.  First, he contends that he is entitled to recover future renewal

commissions pursuant to *Gram v. Liberty Mut. Ins. Co.*, 429 N.E.2d 21 (Mass. 1981) (*Gram I*) and *Gram v. Liberty Mut. Ins Co.*, 461 N.E.2d 796 (Mass. 1984) (*Gram II*), and "because Guardian breached the implied covenant of good faith and fair dealing by terminating him without cause," future renewal commissions are, by definition, "wages under the Massachusetts Wage Act" (Dkt. No. 102 at 22). Fine cites no authority in support of this contention, which is not persuasive. Even if Fine is entitled to recover future commissions pursuant to the *Gram* doctrine, a question addressed below, future commissions would not constitute wages for purposes of the Act, where the statutory definition of wages makes no reference to the *Gram* doctrine or the implied duty of good faith and fair dealing and the requirements that commissions be due and payable and definitely determinable are not satisfied. *See Krause v. UPS Supply Chain Sols., Inc.*, Civil Action No. 08-10237-DPW, 2009 WL 3578601, at *13-15 (D. Mass. Oct. 28, 2009) (the court granted summary judgment on the Wage Act claims because the plaintiff was not eligible for commissions under the terms of the applicable sales incentive plan, but declined to grant summary judgment on her claim for the same commissions based on the implied duty of good faith and fair dealing because she "was substantially involved in the sale of … three accounts and there [was] a genuine issue as to whether Plaintiff's termination was without good cause").

Second, Fine contends that future renewal commissions constitute wages under the reasoning of the *Parker* case, in which the SJC held that "commissions that are not yet due to be paid [when the plaintiff's employment is terminated] may nonetheless constitute lost wages if the employer's violations of the act prevent payment of those commissions." *Parker*, 139 N.E.3d at 335. In essence, Fine contends that *Parker* changed the legal landscape with respect to recovery

of future commission payments as wages.  For its part, Guardian argues that *Parker* is limited to its facts.

In *Parker*, the jury found that EnerNOC, Inc., the plaintiff's employer, had violated the Wage Act by: (1) not paying the plaintiff the full amount of an initial guaranteed sales commission she had earned; and (2) terminating her employment when she complained about EnerNOC's failure to pay her the full amount of the guaranteed initial commission, thereby causing her to lose an additional and substantial "true-up" commission payment to which she was potentially entitled shortly after the first anniversary of the contract's effective date.  *Id.* at 330.  The services contract on which plaintiff was entitled to these commission payments included a "termination for convenience" clause, which permitted either party to terminate the contract within thirty days following the first anniversary of the effective date of the contract. The plaintiff would not have been entitled to the true-up commission payment had either party exercised the termination for convenience clause.  *Id.*  Under EnerNOC's sales commission policy, "a salesperson's eligibility for 'any further [c]ommissions' would cease upon the date of termination of employment 'for any reason.'"  *Id.*  at 331.  Neither party exercised the termination for convenience clause, but the plaintiff was no longer employed by EnerNOC at the time at which she would have been entitled to payment of the true-up commission because she was fired in retaliation for complaining when EnerNOC did not pay her the initial guaranteed commission payment.  *Id.*

The trial judge treated the shortfall in the guaranteed commission payment as wages, subject to mandatory trebling.  He held that the true-up commission payment was not due and payable at the time plaintiff's employment was terminated, and therefore could not be considered

a lost wage.  *Id.* at 334.  The SJC reversed this aspect of the trial court judgment on the grounds that:

> the true-up policy, in conjunction with EnerNOC's retaliatory termination of the plaintiff, made it impossible for the plaintiff to fulfill the only unmet contingency required to collect the true-up commission.  A policy that conditions payment on continued employment cannot relieve an employer from the obligation of paying a commission where the employer terminates its employee in retaliation for complaining about wage violations in the first place.  On these facts, the policy is therefore unenforceable under the Wage Act.

*Id.* at 335 (footnote omitted).

The *Parker* decision does not sweep as broadly as Fine contends.  In explaining its reasoning, the SJC noted that the Wage Act penalizes employers "for failing to pay wages promptly (including any commissions that have been definitely determined and have become due and payable)," *id.* at 335, and "separately" prohibits "retaliation against an employee for seeking to enforce his or her rights under the act."  *Id.*  The court treated EnerNOC's termination of the plaintiff's employment in retaliation for her complaint about EnerNOC's failure to pay her the full amount of her initial sales commission as a violation of the Wage Act separate and apart from a timely failure to pay wages, holding that "as a result of the retaliation, the plaintiff did not receive wages [the true-up commission] she otherwise would have received.  Wages lost as a result of retaliation are trebled under the Wage Act."  *Id.* (footnote omitted) (citing Mass. Gen. Laws ch. 149, §§ 148A, 150).  The instant case is distinguishable from *Parker* in that Fine has disavowed any claim that retaliation or any intention on Guardian's part to deprive him of future commissions was the reason why his association with Guardian – and his entitlement to future commissions – ended (Def. SOF ¶¶ 72-76; Pl. Resp. ¶ 47).

The SJC's observation that it disagreed with the trial court's instruction that a commission payment could not qualify as a wage unless it was "'due and payable' and …

'definitely determined' *as of plaintiff[']s last day of employment*," *id.* at 334 n.10 (emphasis in original), is consistent with cases such as *Israel, Feygina*, and *Levesque*.  In those cases, as noted above, all contingencies for payment of the commissions were satisfied before the plaintiffs parted company with their employers.  In *Feygina*, the amount of incentive compensation due to the plaintiff physician was earned but could not be calculated until some months after her employment ended because the medical practice that employed her needed that time to calculate the expenses and revenue for her practice during the relevant period.  *Feygina*, 2013 WL 3776929, at *2.  There were similar reasons alleged for the delay in commission payments in *Levesque*, 368 F. Supp. 3d at 314 (noting that a delay in the calculation of commissions as to which all contingencies were satisfied before the plaintiff's employment was terminated did not take the commissions outside the scope of the Wage Act), and *Israel*, 2017 WL 1026416, at *7 (noting that the employer needed time to make a final calculation of the commissions owed to the plaintiff when his employment was terminated).

In *Levesque* and *Israel*, the courts held that contractual provisions barring former employees from recovering commissions were unenforceable where all of the contingencies that had to be met for the plaintiffs to claim their commissions had been satisfied before their employment was terminated.  *See Levesque*, 368 F. Supp. 3d at 314; *Israel*, 2017 WL 1026416, at *7.  That does not mean that a provision barring the recovery of commissions after the termination of employment is never enforceable.  The First Circuit has observed that an employer might reasonably "desire to close the books on discharged employees," *Bohne v. Comput. Assocs. Int'l, Inc.*, 514 F.3d 141, 144 (1st Cir. 2008), and the SJC stated in *Parker* that the Court was "not suggest[ing] that a period of continued employment is per se an inappropriate prerequisite upon which to condition a commission."  *Parker*, 139 N.E.3d at 335 n.13.  Contrary

24

to Plaintiff's contention, there is no evidence that Guardian terminated its business relationship with Plaintiff "in order" to deny him future commissions in reliance on the FRA provision that barred further remuneration on termination of the Plaintiff's agreement with Guardian (Dkt. No. 102 at 23-24).  *See id.* (a continued employment contingency "cannot be relied upon by an employer to create circumstances under which the contingency goes unfulfilled *in order* to deny a commission that otherwise would be due and payable to an employee") (emphasis added). Indeed, Plaintiff has conceded that Guardian did not terminate its business relationship with him *in order* to deny him future commissions.  Rather, he has conceded, it did so exclusively because of events that transpired at the Marriott Marquis in Washington, D.C., during the night of May 6-7, 2018.

Fine seeks to recover as wages future commissions which, Fine asserts, Guardian would be able to project in one of two ways, either by relying on industry averages, or based on his historical renewal rate (Dkt. No. 102 at 11).  He does not dispute that, as of the date on which Guardian terminated its agreement with him, he was not entitled to the renewal commissions he seeks to recover in this action.  He does not dispute, nor could he logically do so, that his entitlement to these future renewal commissions was contingent on events that would occur after the termination of his business relationship with Guardian.  Plaintiff has not identified any state (or federal) case treating such future renewal commissions as wages under Mass. Gen. Laws ch. 149, §148A, and the court has found none.  "'If [*Parker*] is to be extended, this is a matter for the Massachusetts courts, and not for [the federal district court].'"  *Bohne*, 514 F.3d at 144 (quoting *Sargent v. Tenaska*, 108 F.3d 5, 10 (1st Cir. 1997)).

Guardian is entitled to judgment on the Third Count in Fine's amended complaint.

D.  Recovery Under *Gram*

25

If Fine can recover at all, it is under the doctrine established in *Gram I*. It bears noting that, to the extent Fine's claim is limited to future renewal commissions on insurance policies he sold before his agreement with Guardian was terminated, Fine seeks recovery for precisely the same losses as did the successful plaintiff in the *Gram* cases.[11] Thus, Guardian's contentions that Fine's claim for losses representing future renewal commissions is impermissibly speculative or contingent fail as a matter of law (Dkt. No. 87-1 at 22-23).

Contrary to Guardian's contention, this court has not held that, to recover for a breach of the implied duty of good faith and fair dealing, Fine must establish that the termination of his agreement was without good cause or in bad faith *with the purpose of depriving him of benefits to which he was entitled* (Dkt. No. 87-1 at 14). That is an inaccurate statement of Massachusetts law because "where an at-will employee is discharged without good cause, but the employer has not acted in bad faith [by terminating an employee to deprive him of a commission which was due to him], the employer is [still] liable under the obligation of fair dealing 'for the loss of compensation that is so clearly related to an employee's past service.'" *York*, 849 N.E.2d at 899 (quoting *Gram I*, 429 N.E. 2d at 29). *See Fine v. Guardian Life Ins. Co. of Am.*, 450 F. Supp. 3d 20, 29 (D. Mass. 2020) (noting that in *Gram I*, the SJC extended the *Fortune* doctrine to cover employees who were not discharged in bad faith but who were deprived of compensation clearly related to the employee's past services). The First Circuit has acknowledged that:

> *Gram* extended the *Fortune* doctrine to require employers who terminate "without good cause" – even though without bad-faith intent – to pay any compensation clearly related to employees' past services, even if not yet contractually due. So

---

[11] To the extent that Fine seeks to recover additional retirement compensation, he is not entitled to do so under *Gram II*, which held that damages were "to be measured, in their 'outer limit,' by renewal commissions" measured by the terms set forth in *Gram I*. *Gram II*, 461 N.E.2d at 798. He cannot recover any enhancement to his retirement compensation. *See id.* The so-called "renewal runoff" described by Fine appears to be duplicative of the loss of future renewal commissions. A plaintiff is not entitled to a duplicative recovery. *See, e.g., Mailman's Steam Carpet Cleaning Corp. v. Lizotte*, 616 N.E.2d 85, 89 (Mass. 1993).

> (in theory) a lawsuit might fail under *Fortune* yet succeed under *Gram* – e.g., if the employee was fired for a baseless reason – although Massachusetts case law has interpreted "good cause" very liberally in favor of employers.

*Bohne*, 514 F.3d at 144 (citations omitted).  *See also Suzuki v. Abiomed, Inc.*, 943 F.3d 555, 562 (1st Cir. 2019) (noting that, following the SJC's decisions in *Gram*, "[a]lthough termination of employment without good cause is not alone a breach of the implied covenant, an employer may sometimes be held liable for lost compensation that 'clearly related' to the dismissed employee's 'past service'") (quoting *Gram I*, 429 N.E.2d at 28-29).

1. Whether Guardian had Just or Good Cause to Terminate its Agreement with Fine is a Jury Question

Even if Massachusetts case law has interpreted "good cause" liberally in this context, there is "[n]o doubt that whether a termination was for good cause commonly presents a fact question for the jury." *York*, 849 N.E.2d at 900 (citing *Goldhor v. Hampshire Coll.*, 521 N.E. 1381, 1384 (Mass. App. Ct. 1988)).

Guardian argues that the court should, as a matter of law, find that it had good cause to terminate its business relationship with Fine, relying on the following undisputed facts: Guardian had been told that a female guest at the Marriott Marquis had accused Fine of raping her; someone called an ambulance; the woman went to the hospital to have a rape kit performed; an unidentified man said he heard screams; Marriott security personnel told Fine he had to leave the hotel premises where Guardian was conducting the conference; and Guardian had escalated the issue to the crisis response committee of its board of directors, whose members agreed that Guardian's agreement with Fine should be terminated (Dkt. No. 113 at 6).[12]  For his part, Fine

---

[12] Guardian argues in a footnote that even if the information it had when it decided to end its agreement with Fine was insufficient to support termination for good cause, information it subsequently acquired shows good cause as a matter of law (Dkt. No. 87-1 at 20 n.11).  The case Guardian cites in support of this proposition was decided under Delaware law. *See Strobek v. Muggia*, No. 14-P-1299, 2016 WL 320215, at *2-3 (Mass. App. Ct. Jan. 27, 2016) (unpublished).

asserts that the facts do not establish good cause as a matter of law because, viewing the record

in the light most favorable to him, he was falsely accused of rape and Guardian had been

informed before it terminated Fine's agreement that Fine had evidence that the accusation was

false and that the police were not going to arrest or charge him at that time.  Fine argues that

good cause is at least a question of fact where "Guardian made no further inquiry, *never spoke to*

*Mr. Fine*, and acted solely on the basis of an allegation" (Dkt. No. 102 at 14).

> Massachusetts courts have consistently defined good cause (occasionally referred
> to as "just" or "due" cause) as the existence of either "(1) a reasonable basis for
> employer dissatisfaction with a new employee, entertained in good faith, for
> reasons such as lack of capacity or diligence, failure to conform to usual standards
> of conduct, or other culpable or inappropriate behavior, or (2) grounds for
> discharge reasonably related, in the employer's honest judgment, to the needs of
> [its] business."

*York*, 849 N.E.2d at 899 (quoting *G&M Emp't Serv. Inc. v. Commonwealth*, 265 N.E. 2d 476,

480 (Mass. 1970), *appeal dismissed* 402 U.S. 968 (1971); citing additional cases); *see also Joyal*

*v. Hasbro, Inc.*, 380 F.3d 14, 21 (1st Cir. 2004) (same).  Plaintiff was not a new member of

Guardian's sales force and there is, in any event, no evidence of lack of capacity or diligence.  In

*York*, at least, the ground for discharge that reasonably related to the needs of the business was a

cost-cutting measure that affected multiple employees and the factual record on this issue was

undisputed.  *York*, 849 N.E.2d at 900.  It is not so obvious that failing to cut ties with Fine risked

damage to Guardian's reputation if the accusation against Fine was false.

---

It is not clear whether this court can rely on after-acquired information.  "In the rare
opportunities that [the SJC] and the [Massachusetts] Appeals Court have had to consider the
issue of after-acquired evidence in the context of a termination from employment, neither of the
courts has adopted, or declined to adopt, this doctrine."  *EventMonitor, Inc. v. Leness*, 44 N.E.3d
848, 851 (Mass. 2016) (citing *Flesner v. Tech. Commc'ns Corp.*, 575 N.E.2d 1107, 1113-14
(Mass. 1991); *Prozinski v. Ne. Real Estate Servs.*, 797 N.E.2d 415, 425 (Mass. App. Ct. 2003)).
The court declines to decide this issue in the absence of developed argument.

The meaning of just or good cause in this area of the law is less than clear, *see Weiss v. DHL Express, Inc.*, Civil Action No. 10-10705-NMG, 2011 WL 13137940, at *6 (D. Mass. Nov. 16, 2011), *recommendation adopted,* 2011 WL 13141598 (D. Mass. Dec. 7, 2011), *rev'd on other grounds*, 718 F.3d 39 (1st Cir. 2013), and cases addressing justifications for discharge are highly fact dependent, making generalization difficult.  Because Guardian's decision to sever its relationship with Fine was premised on what it heard or believed about Fine's conduct, the court seeks guidance in cases where the employer's action was premised on its knowledge or belief about an employee's work-related conduct.  In *Gram I*, following a jury trial, the SJC held that the employer, Liberty Mutual Insurance Company (Liberty), was liable to the plaintiff for future renewal commissions where the jury reasonably could have found that the termination of plaintiff's employment was "bad, unjust, and unkind" because, notwithstanding the supervisors' belief, the employee did not violate any company policy and the termination was "the product of inadequate investigation."  *Gram I*, 429 N.E.2d at 28.  In contrast, in *Young v. Fid. Research & Analysis Co.*, No. 14-P-688, 2015 WL 2401360 (Mass. App. Ct. May 21, 2015) (unpublished), one of the cases on which Guardian relies, the court held that the defendant employer was entitled to judgment where the employer took no adverse action until the New York Stock Exchange (NYSE) had completed disciplinary proceedings and officially sanctioned the plaintiff for misconduct (a proceeding which took about a year), after which the employer discharged the employee.  *Id.* at *2.  In *Young*, the Massachusetts Appeals Court affirmed summary judgment for the employer on the plaintiff's *Gram* claim because the plaintiff's culpable or inappropriate behavior constituted good cause to terminate his employment and no reasonable factfinder could have disbelieved the employer's stated reason for discharging the plaintiff.

Guardian argues that, even if Fine was falsely accused of rape, his conduct at the Marriott Marquis demonstrated poor judgment, resulted in disruption to the schedules of senior-level Guardian managers, and was judged by the Guardian board's crisis committee and its chief executive officer to pose a risk to Guardian's reputation.  A reasonable jury could conclude that Guardian's grounds for severing its relationship with Fine were reasonably related, in Guardian's honest judgment, to the needs of its business and that the termination of its agreement with Fine was for just or good cause.  *York*, 849 N.E.2d at 899.  A jury could also reasonably find otherwise.  Fine contends that he was falsely accused, that he promptly arranged to provide information demonstrating to law enforcement that the accusation was false, that the company had been informed that Fine would not be arrested or charged, at least at that time, and that Fine asked Guardian (through his brother Randy) to hold off on discharging Fine.  Guardian's decision to move forward immediately with terminating its agreement with Fine, without further investigation, might be found to be arbitrary or capricious and, therefore, lacking good or just cause.  *See Weiss*, 2011 WL 13137940, at *6.  In short, this is a jury question.

> ## 2. Any Limits on Recovery in the FRA Cannot Bar Fine's Recovery of Future Renewal Commissions

Guardian argues with some force that the terms of the FRA preclude Fine's post-termination recovery of future renewal commissions (Dkt. No. 113 at 14-15).  The FRA provided that "[o]n termination, [Guardian's] liability for remuneration of any kind shall cease except as set forth in the Field Representative Plan" and that, "except as provided in the [FRP], there is no vesting of commissions" (Dkt. No. 9-1 at 5, 6).  As a general proposition, the implied covenant of good faith and fair dealing "may not be 'invoked to create rights and duties not otherwise provided for in the existing contractual relationship ….'"  *Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 684 (Mass. 2005) (quoting *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*,

805 N.E.2d 957, 964 (Mass. 2004)).  In *Gram II*, the SJC declined to consider Liberty Mutual's contention that the plaintiff "was limited by his compensation agreement to certain final adjustments and no more" on the grounds that Liberty Mutual had not raised the argument on a timely basis, *Gram II*, 461 N.E.2d at 798, leaving the question unresolved.

There are two factors that the court cannot overlook as it considers Guardian's argument. The first is the SJC's decidedly skeptical view of the contention.  In declining to consider Liberty Mutual's argument that the terms of the parties' agreement prohibited Gram's recovery of future renewal commissions, the SJC observed that the Court "need not … consider … whether, by agreement, an employer and an employee may restrict the rights of an at-will employee to compensation based on the windfall to an employer who, by discharging the employee without good cause, deprives the employee of clearly identifiable future compensation reflective of the employee's past services."  *Id.*

The second is that, although *Gram II* was decided in 1984, more than 35 years ago, neither the SJC nor the Massachusetts Appeals Court, has, in the interim, held – or implied – that an insurance company in Guardian's position can, by agreement, restrict the rights of a member of its salesforce to recover future renewal commissions to the extent set forth in *Gram II* when the salesperson has been discharged without just or good cause, as is alleged by Fine.  The cases cited by Guardian are all distinguishable.  In *Harrison v. NetCentric Corp.*, 744 N.E.2d 622 (Mass. 2001), the plaintiff sought to recover the full market value of shares to which his rights had not vested when his employment with the company was terminated.  The Court held that the defendants had not violated the implied duty of good faith and fair dealing by paying him the nominal amount to which he was entitled for the unvested shares under his employment agreement because "[h]is shares vested over time only if he continued to be employed; thus, the

unvested shares [were] not earned compensation for past services, but compensation contingent on his continued employment." *Id.* at 630. The court distinguished an employee's right – established in *Fortune* and *Gram I* – to recover commissions for sales made during an individual's tenure as an active employee. *Id.* at 631. *See also Suzuki*, 943 F.3d at 564-66 (holding that the employee was not entitled to recover additional incentive compensation where his employment agreement only entitled him to the compensation if the required milestones were achieved during his active employment). *Maddaloni v. W. Mass. Bus Lines, Inc.*, 438 N.E.2d 351 (Mass. 1982), another case cited by Guardian, represents a straightforward application of the *Fortune* doctrine: the Court held that the plaintiff, who had obtained interstate charter rights for the defendant corporation, "could reasonably expect that his employment would not be terminated by the defendant in order to deny him commissions." *Id.* at 354. Consistent with *Fortune* (and the subsequent *Gram* cases), the Court held that the plaintiff, as an at-will employee, was entitled, on the strength of *Fortune*, to recover future commissions, but was not entitled to recover for lost wages and fringe benefits even though the jurors reasonably found that his employment was terminated in bad faith. *Id.* at 355-56. In *Barsamian v. Corp. Express Office Prods., Inc.*, No. 05-P-1054, 2006 WL 2506216 (Mass. App. Ct. Aug. 30, 2006) (unpublished), the Massachusetts Appeals Court carefully distinguished the facts in *Gram*, noting that the panel could "discern nothing in the payment of commissions by Corporate Express that in any way [was] comparable to the scheme of 'renewal commissions' in *Gram*." *Id.* at *5.

So far as the court has been able to determine, *Krause* is the only case in which a court has addressed an employer's motion for summary judgment on a plaintiff's claims for unpaid commissions under both the Wage Act and the implied duty of good faith and fair dealing where

the employer argued that the plaintiff was ineligible for commissions based on a compensation

plan that required continued employment as a condition for paying commissions.  *Krause*, 2009

WL 3578601, at *3-4.  The plaintiff in *Krause* was terminated as an employee of UPS Supply

Chain Solutions, Inc. (UPS) in a downsizing.  She alleged that her discharge was the result of

gender discrimination and retaliation and she asserted claims under the Wage Act and the

implied contractual duty of good faith and fair dealing for commissions for which she had done

the work prior to the termination of her employment and that would have been awarded had she

remained employed.  *Id.* at *1-4.  At the summary judgment stage, the judge held that a provision

in UPS's 2006 sales incentive plan, which "expressly state[d] that a terminated employee would

not be eligible for any [commission] payments due after the date of termination" barred the

plaintiff's Wage Act claim because the commissions were neither "due and payable" nor

"definitely determined" when the plaintiff's employment was terminated.  *Id.* at *13-14.

Calling the *Fortune*/*Gram* doctrine "'well established under Massachusetts law,'" *id.* at

*14 (quoting *Bohne*, 514 F.3d at 143), the judge denied summary judgment to UPS on the breach

of contract claim on the following grounds:

> Because the Plaintiff was substantially involved in the sale of these three accounts
> and there [was] a genuine issue as to whether the Plaintiff's termination was
> without good cause, [the court] concludes that a factfinder could determine that
> Plaintiff should recover commissions under the implied covenant of good faith
> and fair dealing, even if those commissions were not yet due under the strict terms
> of the [governing incentive plan].

*Id.* at *15.

This court's ruling is consistent with the ruling of the court in *Krause*.  Unless and until

the Massachusetts courts rule that a company may restrict the right of an at-will employee or

independent contractor to recover future renewal commissions following a discharge that is

without just cause, a claim such as the one advanced by Fine in the First Count in his amended complaint remains viable under Massachusetts law.

## III.     CONCLUSION

For the foregoing reasons, Guardian's motion for summary judgment (Dkt. No. 87) is DENIED with respect to the First Count in the amended complaint and ALLOWED with respect to the Second and Third Counts in the amended complaint.  The Clerk's Office is directed to schedule a status conference on a date mutually convenient to the parties and the court.

It is so ordered.

March 7, 2022                         /s/ Katherine A. Robertson
                                      KATHERINE A. ROBERTSON
                                      U.S. MAGISTRATE JUDGE